v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, DIVISION OF FAMILY & YOUTH SERVICES, Appellee.

No. S–9902.

Supreme Court of Alaska.

Dec. 24, 2001.

Guy Kerner, Assistant Public Defender, Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Mary A. Gilson, Vennie E. Nemecek, Assistant Attorneys General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

J.J. appeals the superior court's termination of her parental rights to her son and daughter. Because it was error to find that continued custody with J.J. is likely to result in serious emotional or physical damage to the children, we reverse.

## II. FACTS AND PROCEEDINGS

On February 22, 1998, J.J. left her four-year old daughter and two-year old son at home alone while she and her friend went to a liquor store. The children wandered outside, at night, dressed only in their underclothes. They were found by strangers and taken inside by a neighbor, who called the Anchorage Police. J.J. returned home after approximately an hour-and-a-half, intoxicated and unaware that her children had left the house. J.J. was arrested, and the State took the children into custody.

J.J. was convicted of child neglect and incarcerated for forty-five days. While J.J. was in jail, she saw her children only once. Both J.J. and her children ended that visit crying after J.J. was forced to tell her children that she could not leave with them.

Larry Overholser, a social worker for the Division of Family and Youth Services (DFYS), was assigned to the children's case.

Overholser first met with J.J. during a court review hearing on March 16, 1998. At that meeting, Overholser discussed J.J.'s case plan with her "in general," and arranged for J.J. to be evaluated at Alaska North Addictions Recovery Center (ANARC) on April 13, 1998. Although Overholser testified that the case plan required J.J. both to complete alcohol treatment and to visit her children regularly, the written case plan only specified activities related to J.J.'s problem with substance abuse: maintaining sobriety; submitting to urinalysis; obtaining treatment for substance abuse; and attending Alcoholics Anonymous meetings.

Following a subsequent in-chambers conference meeting on March 26, which J.J. may not have attended, Overholser called J.J. and gave her a phone number to call to set up visitation with her children. Although J.J. made an appointment to visit her children, she did not attend that appointment. She also did not attend her scheduled evaluation at ANARC. J.J. had no further contact with either DFYS or her children for over one year, until May 1999.[1] She also lost touch with her lawyer from the Alaska Public Defender Agency, who withdrew from the case in July 1998.

J.J. continued to drink during the rest of 1998, but stopped drinking in January or February of 1999 when she learned she was pregnant. J.J. had been trying to arrange for admission to ANARC as early as November or December of 1998, but had been unable to find a charity bed. After her boyfriend offered the $450 required for admission to ANARC in February 1999, J.J. was placed on a wait list; she was admitted to ANARC on May 10, 1999.

A week-and-a-half or two weeks after being admitted to the inpatient program, J.J. called Overholser to ask about regaining custody of her children. J.J. and her inpatient counselor both testified that Overholser told them that J.J.'s parental rights had already been terminated. Overholser testified, however, that he only told J.J. that she needed to contact her lawyer.

DFYS petitioned to terminate J.J.'s parental rights on May 21, 1999, at about the same time as J.J.'s call to Overholser. After learning that her parental rights had not, in fact, already been terminated, J.J. sought assistance to contest the termination, and was granted court-appointed counsel on August 30, 1999. J.J. successfully completed inpatient, intensive outpatient, and continuing care treatment at ANARC by September 30, 1999, and, according to her inpatient counselor, has continued to do well since then.

At the start of the November 8, 1999 termination trial, J.J.'s counsel unsuccessfully sought a continuance. After a one-day trial, the superior court terminated J.J.'s parental rights. The court terminated the parental rights of the children's father, C.J., at the same time.[2] In terminating J.J. and C.J.'s parental rights, the court found that both parents had abandoned the children, and that it was in the children's best interests that they be given the permanency of an adoptive family.

J.J. appeals the termination of her parental rights.

## III. STANDARD OF REVIEW

■ The superior court's findings of fact will be upheld unless they are clearly erroneous, but whether the factual findings comport with the requirements of the Indian Child Welfare Act is a question of law that this court will review de novo.[3]

## IV. DISCUSSION

**It Was Error to Find That Custody of the Children by J.J. Is Likely to Result in Serious Emotional or Physical Damage to the Children.**

Because J.J. is an Alaska Native, her children are Indian children protected by the

---

**1.** After J.J. disappeared, Overholser tried to reinitiate contact with her once, but without success.

**2.** The termination of the father's parental rights was subsequently reversed by this court. *C.J. v.*

*State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214 (Alaska 2001).

**3.** *See A.A. v. State, Div. of Family & Youth Servs.*, 982 P.2d 256, 259 (Alaska 1999).

Indian Child Welfare Act (ICWA).[4] Under ICWA, parental rights cannot be terminated "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of a qualified expert witness, that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child." [5] In its written order, the superior court found that this requirement of ICWA had been satisfied.

J.J. argues that the court erred in finding that the children were likely to be seriously harmed if they remained in her custody. She argues that she has remedied the conduct—her alcohol abuse—that placed her children at risk of physical harm, and that because the children were not going to remain with their current foster parents,[6] placing the children with J.J. will be no more emotionally disruptive to them than will placing them in another home.

In reply, the State points to the testimony of its expert, Dr. Clarson, that J.J.'s successful completion of her alcohol abuse treatment program has not remedied the effects of her abandonment of the children and that J.J.'s period of sobriety was, in any event, too short to justify an assumption that J.J. will not relapse. The State also notes that J.J. has no record of successful parenting to counterbalance the likelihood that her parenting failures in the past would recur in the future.

There is evidence that J.J. has taken steps to put herself in a position to parent her children. J.J.'s written case plan only specifies activities—abstaining from alcohol, urinalysis testing, substance abuse treatment, and Alcoholics Anonymous meetings—related to J.J.'s substance abuse. J.J. admittedly

did not show up for her scheduled April 13, 1998 assessment at ANARC, and continued to drink for the rest of 1998. But J.J. ultimately did stop drinking in January or February of 1999, when she learned she was pregnant. Moreover, she successfully completed a treatment program for her alcohol abuse and, according to her inpatient counselor, has continued to do well since then. J.J. has also entered into a supportive, sober relationship with a man who paid the costs of her alcohol abuse treatment and testified as to his willingness to continue to support her financially and emotionally.

But the State argues that the children should not be returned to J.J.'s custody, notwithstanding any progress by J.J. or change in her situation. To support its position, the State relies in large part on the testimony of Dr. Clarson.

After reviewing files supplied by the State, but without interviewing J.J. or her children, Dr. Clarson recommended that the court not return the children to J.J. Dr. Clarson testified that substance abuse and abandonment are separate issues and that remedying J.J.'s alcohol abuse "does[not] change anything for the children who have had no contact for ... around two years" with their mother. Dr. Clarson also suggested that J.J.'s completion of "two months" of inpatient and outpatient care at ANARC was insufficient to justify an assumption that J.J. would maintain her sobriety.

Dr. Clarson concluded that the children had been harmed while in J.J.'s care and by her subsequent abandonment, that it was "not clear" that the children would not suffer additional trauma if J.J. regained custody, and that the risks continue.[7] When asked

---

4. 25 U.S.C. §§ 1901–1923.

5. 25 U.S.C. § 1912(f).

6. The foster mother testified that she had no plan to adopt the children and was planning to parent the children only until they were adopted into another home.

7. Dr. Clarson's testimony on this point was as follows:

Q  Would you recommend returning—based on the information that you have, would you recommend returning the children to the parents?

A  I would not.
Q  And can you tell us why not?
A  Because I would have concerns that the previous beha—the previous experiences, A, have been pretty traumatic for the children, and it's not clear to me that there's any likelihood that these could not happen again.
Q  You mentioned previously that the children have been placed at risk?
A  Yes.
Q  Do you believe that that risk continues?
A  Yes. I guess that there's one other issue with children who have been placed at risk. The risks don't get erased, and so if kids already

how long a period of sobriety J.J. would have to demonstrate before her "fears were quelled," Dr. Clarson answered "at least a year." [8] Dr. Clarson was also asked if J.J. were to stay sober for another six months whether the children could be returned to her care. She answered that she thought six months would be too soon and "that there would need to be some very, very clear demonstration of her ability to, and willingness to, keep in contact with them on a regular basis, and have supervised, supported visitation for the long term . . . ."

■ Does Dr. Clarson's testimony support the ICWA-mandated finding beyond a reasonable doubt that placing the children with J.J. will likely result in serious damage to them? The question is a close one. Its resolution depends on both an analysis of the basis for Dr. Clarson's testimony and the options available to the trial court.

We have already reviewed Dr. Clarson's testimony as it relates to termination of the parental rights of the children's father, C.J. In reversing the trial court's decision to terminate C.J.'s parental rights, we noted that

the conclusions of Dr. Clarson are considerably weakened by the fact that she received all information about this case from reading the file given to her by DFYS and never met or spoke with either C.J. or the children prior to the hearing.[9]

We also remarked that Dr. Clarson's conclusions about the unsuitability of placing the children with their father "appear to be little more than generalizations about the harms resulting from a parent's absence and provide little discussion of the particular facts of this case." [10]

Our concerns about Dr. Clarson's testimony in *C.J.* apply to J.J.'s case as well. Not only did Dr. Clarson not meet or speak with J.J., J.J.'s children, or J.J.'s counselors at ANARC, but the file upon which Dr. Clarson relied was also significantly incomplete. Although she was aware that J.J. had entered ANARC in May 1999, Dr. Clarson received "no further documentation about what happened after that." Dr. Clarson was thus initially unaware that J.J. had successfully completed a course of treatment at ANARC. And because she had never spoken to J.J.'s inpatient counselor, Dr. Clarson never learned that J.J. had continued to be sober since release from the program.

At trial, Dr. Clarson stated that she would like to see "at least a year [of sobriety]" on J.J.'s part before her concerns about the suitability of placing the children with J.J. would be relieved. However, because Dr. Clarson did not know that J.J. had been sober since at least February of 1999, she was unaware that J.J. was only two to three months from meeting the goal of "at least a year" of sobriety.

As to the options before the trial court, the court could have deferred resolution of the termination proceedings and asked DFYS to re-establish visitation with the children for a limited additional period of time contingent on J.J.'s continued sobriety and such other factors as might be appropriate. At the conclusion of the additional period, or upon violation of the conditions, supplemental evidence could be presented on the critical predictive finding. At that point a reasonable person could with greater confidence decide whether the State had met its burden of demonstrating the likelihood of future serious harm to the children.

Under the facts of this case this option was available to the court without interrupting an established relationship, as the children had

---

have some risks accumulated and then experience additional circumstances that add to those risks, that decreases their chances tremendously for doing well.

Q And just to be clear, when we talk about risk, what kind of risk are we talking about?

A Well, we're talking about early experiences of abuse, neglect, witnessing violence, being left alone, and separation from their two primary attachment figures.

Q And do these types of risks qualify as serious physical and/or emotional harm?

A They do.

8. She added that "a year of sobriety on her part, that's already added to two years of lack of contact with the children, which is a huge problem for them."

9. *C.J. v. State, Dep't of Health & Soc. Servs.,* 18 P.3d 1214, 1218 (Alaska 2001).

10. *Id.*

not been permanently placed. Absent a trial period along the lines described above, we do not believe that a reasonable fact finder could conclude without reasonable doubt that placement of the children with J.J. would likely cause them serious damage.

J.J.'s case can be contrasted with that of *E.M. v. State, Department of Health and Social Services,* in which this court upheld the termination of a father's parental rights.[11] In *E.M.,* the evidence showed that the father had made no progress in meeting the requirements of his case plan and that he continued to live in an unsafe environment.[12] Unlike E.M., J.J. has made substantial progress in meeting the requirements of her case plan and seems to have established a safe home for her children.

J.J.'s case can also be contrasted with that of *L.G. v. State, Department of Health and Social Services,* in which this court upheld the termination of the mother's parental rights in part based on the finding that removing the children from their current permanent placement, which would be necessary for them to be reunited with their biological mother, would cause the children serious emotional harm.[13]

Past addictive behavior and associated parenting failures may be predictive of similar conduct in the future. But a substantial period of sobriety before trial casts doubt on the reliability of predictions based on the earlier conduct. In such circumstances uncertainties can be reduced by a limited period of renewed contact between parent and children. In the absence of such a step in this case, we conclude that the evidence was insufficient to show beyond a reasonable doubt that continued custody by J.J. is likely to result in serious damage to the children.

## V. CONCLUSION

We REVERSE the judgment and REMAND for further proceedings consistent with this opinion.

11. 959 P.2d 766, 771 (Alaska 1998).

12. *Id.* at 769–70.

13. 14 P.3d 946, 950–51 (Alaska 2000).