No. 04-364

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 19

IN THE MATTER OF

A.N. and M.N.,

Youths In Need Of Care.

APPEAL FROM:    The District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DN 2002-022,
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Nancy G. Schwartz, LaRance, Syth & Schwartz, P.C., Billings, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; Mark W. Mattioli,
Assistant Attorney General, Helena, Montana

Dennis Paxinos, County Attorney; Richard Helm, Deputy County
Attorney, Billings, Montana

Damon L. Gannett, Attorney at Law, Billings, Montana (Guardian Ad Litem)

Submitted on Briefs:  January 4, 2005

Decided:  February 1, 2005

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 T.N. (Father) appeals from the District Court's Order terminating his parental rights. We affirm.

## BACKGROUND

¶2 A.N. (Son) is fourteen years old, and M.N. (Daughter) is twelve years old. They are registered members of the Sioux Tribe from the Fort Peck Reservation. Father lives in Billings, and C.N. (Mother) currently lives in South Dakota. This case concerns the fourth time the Department of Public Health and Human Services (the Department) or the Bureau of Indian Affairs Social Services has had to remove these children from Father's custody because he has abused and neglected them. Soon after Father and the children were reunited for the second time, they moved in with C.D. (Father's Mother) and I.D. (Stepfather) who are Father's mother and stepfather, respectively. Because Stepfather is a convicted and untreated child sex-offender, the Department had concerns about leaving the children with Father. Father promised that he would not allow the children to be around Stepfather and would closely supervise them.

¶3 In the most recent case, the Department had returned Son and Daughter to Father in the fall, after Father had completed inpatient chemical dependency treatment in Butte in July 2001. In February 2002, the three again moved into Father's Mother's and Stepfather's home. The next month, Father, Daughter, Father's Mother, and four others traveled to Boulder and went to a basketball game in Butte. While they were on the trip, the Billings Police Department responded to a 911 call at the residence to find Son and M.B., Son's

cousin (Male Cousin), sleeping on mattresses on the living room floor. Stepfather and D.W. (Stepfather's Friend) were babysitting them.

¶4   Upon arriving, the police officers discovered that Stepfather's Friend was extremely intoxicated, Stepfather was a registered child sex-offender, and living conditions in the house were deplorable. Old food, dishes, and garbage were scattered about and the quantity of clothes on the floor prevented the officers' from moving easily in the house. The lights in the bathroom, bedroom, and kitchen were out, so the officers had to use flashlights. The Department removed the children for the fourth time.

¶5   Male Cousin made allegations of sexual abuse against Father soon afterward. Father had been convicted of two DUIs and, at one time, had left his children at a gas station while he went to a residence three blocks away. The combination of these circumstances presented a danger to the children. To prevent further danger, the Department suspended all contact between Father and the children. The Department was willing to reinitiate contact, but it wanted to review Father's sex-offender evaluation first.

¶6   In December 2002, the Department finally received Father's sex-offender evaluation completed in August. The Department had paid for the evaluation. Since the evaluation showed Father was a low-risk sex-offender, he expected the Department to allow him to see his children. Later that month, Father visited Pam Weischedel, the social worker assigned to the case, to request telephone contact with his children. Although Weischedel was willing to arrange the conversation, Father refused to give her any contact information that she could use to make those arrangements. For the nine months following—from December 2002 until

3

September 2003—Father did not contact Weischedel or provide any contact information besides a post office box.

¶7     Between the adjudication of the children as Youths in Need of Care and the termination hearing, the District Court developed two treatment plans for Father. Father's first treatment plan required him to obtain a sex-offender evaluation, not to involve himself in any criminal activity, to agree that the Department may place the children in a temporary facility for their protection, to obtain a chemical dependency evaluation and follow the resulting recommendations, to attend Alcoholics Anonymous or Narcotics Anonymous meetings, to submit to random drug screens, to maintain an adequate home, to keep alcohol out of the home, to attend family or individual counseling sessions, to attend a parenting class, to maintain weekly contacts with the social worker, to maintain income through employment or other legal means, to sign various releases, and not to have any contact with his children until deemed appropriate by the Department.

¶8     Of those thirteen tasks, Father completed only the first three. He obtained a sex-offender evaluation, did not involve himself in criminal activity, and assented to the Department placing the children with their grandparents. He simply failed to complete the next nine tasks, and he failed the last task by showing up intoxicated outside the foster home to see his children. His second treatment plan tasks and his failure to complete those tasks were similar to the first treatment plan tasks and his failures therein.

¶9     The District Court found Father totally unbelievable when he said he tried to work with Weischedel but that she put up barriers to his completion of the treatment plans. The

4

Department paid for Father's sex-offender evaluation. Weischedel held two family group decision-making meetings to help identify and discuss the issues of concern so the reunification of the children with at least one parent could occur. Father and Mother attended both meetings.

¶10 Because of car trouble, Father missed the good-bye visit in August 2002, when the Department moved the children to live with relatives in North Dakota. Weischedel tried to stay in touch with him, but neither he nor his mother was willing to give Weischedel an address or telephone number. Over those eighteen months, Father lived at three friends' houses in Montana, at a friend's house in Wyoming, at various motels, and at his mother's house.

¶11 The District Court certified Sheila Standing as an Indian Child Welfare Act (ICWA) expert. She is a tribal member and was raised according to tribal traditions and practices. Applying Indian cultural norms, Standing specifically concluded that the children would likely be exposed to serious physical or emotional damage if the District Court returned them to Father.

¶12 Standing's conclusion was based on several factors. First, Father had no permanent home and no steady job. Second, based on her impressions from the file, the children seem to have been afraid of him. Third, she believed he was incapable of being a good father until he received some alcohol treatment and counseling. Fourth, she believed the children were spending too much time around Stepfather, a registered sex-offender. Standing never met

5

with Father, Mother, Son, or Daughter, but based on her review entirely on the Department's files.

¶13    After considering the heightened evidentiary requirements in ICWA, 25 U.S.C. § 1912 (2004), the District Court terminated Father's parenting rights.  We restate the issues as follows:

¶14    1.  Whether the Department provided active efforts under § 1912.

¶15    2.  Whether the ICWA witness must meet with the parties before testifying on the question whether continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

¶16    3.  Whether the District Court abused its discretion in failing to grant Father's request for an extension of temporary legal custody.

**STANDARD OF REVIEW**

¶17    This Court reviews a district court's decision to terminate parental rights to determine whether the district court abused its discretion.  A district court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice.  *In re D.B.*, 2004 MT 371, ¶ 29, 325 Mont. 13, ¶ 29, ___ P.3d ___, ¶ 29.

¶18    This Court reviews a district court's findings of fact supporting termination to determine whether they are clearly erroneous.  Those facts will be clearly erroneous when (1) substantial evidence fails to support the district court's finding; (2) when the district court

6

misapprehended the effect of the evidence; or (3) when, after reviewing the record, this Court has a definite and firm conviction that the district court made a mistake. *D.B.*, ¶ 30.

¶19 In an ICWA case, we will uphold the district court's termination of custody if a reasonable fact-finder could conclude beyond a reasonable doubt "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Section 1912(f); *J.J. v. Alaska* (Alaska 2001), 38 P.3d 7, 11. Likewise, in an ICWA termination of custody case, we will uphold the district court's determination that the Department made active efforts if a reasonable fact-finder could conclude beyond a reasonable doubt that the Department's efforts were active. Sections 1912(d), (f); *In re G.S.*, 2002 MT 245, ¶ 33, 312 Mont. 108, ¶ 33, 59 P.3d 1063, ¶ 33; *J.J.*, 38 P.3d at 11.

## DISCUSSION

### I

¶20 The children are younger than 18 years of age and are members of an Indian tribe recognized by the Secretary of the Interior as eligible for the services provided to Indians. Accordingly, ICWA covers any proceedings that involve the termination of parental rights to the children. Sections 1903(4), (8) and 1912(d). Father argues that the Department failed to provide the active efforts required by ICWA. Section 1912.

¶21 Congress enacted ICWA to keep Indian tribes and families together by establishing minimum federal standards for removing Indian children from their families. Section 1902. Montana has integrated these standards and required proceedings involving child abuse and

7

neglect to conform to the standards of proof outlined in ICWA. Section 41-3-422(5)(b), MCA.

¶22 ICWA requires that

[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

Section 1912(d) (emphasis added). Further,

[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Section 1912(f).

¶23 The term active efforts, by definition, implies heightened responsibility compared to passive efforts. Giving the parent a treatment plan and waiting for him to complete it would constitute passive efforts. Despite this heightened emphasis on the state's responsibilities, the Alaska Supreme Court, in determining whether the state had made active efforts, has held that a court may consider a parent's demonstrated apathy and indifference to participating in treatment. *E.A. v. Alaska* (Alaska 2002), 46 P.3d 986, 991.

¶24 Weischedel held two family group decision-making meetings and the Department paid for Father's sex-offender evaluation. Although Weischedel arranged a good-bye visit before the children moved to North Dakota to live with relatives for a while, Father failed to appear.

8

Between December 2002 and September 2003, Father disappeared except for one visit to Weischedel to try to talk to his children.

¶25     With Father so completely unavailable, Weischedel could not have been more active. Father left her no phone number and no address and moved between multiple residences. The Department's efforts were as active as possible.  It was Father's apparent apathy and indifference that prevented him from completing his treatment plans.  Without any involvement, even to the absolute minimal level of giving Weischedel his contact information, Father prevented the Department from making active efforts at providing more intensive services.  We hold that a reasonable person could have found, beyond a reasonable doubt, that the Department's efforts were sufficiently active to satisfy § 1912(d).  Thus, we affirm the District Court.

## II

¶26     Father relies on *J.J.* and *C.J. v. Alaska* (Alaska 2001), 18 P.3d 1214, for the proposition that the ICWA expert must have more experience with the case than simply reading the Department's file.  He contends that the ICWA expert's testimony must be based on personal interviews.  In the present case, Standing, the Department's expert witness, did not personally meet with Father or the children.

¶27     ICWA requires the evidence for terminating parental custody to "includ[e] testimony of *qualified expert witnesses*[] that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."  Section 1912(f) (emphasis added).

¶28     Father misunderstands the standard. Section 1912(f) requires only that the evidence include testimony by a qualified expert witness; the statute does not require a specific form of that testimonial evidence. *J.J.* and *C.J.* are easily distinguishable from the facts in this case.

¶29     Those two cases involve the parents of the same children. J.J is the mother, and C.J. is the father. *See J.J.*, 38 P.3d at 8. In *C.J.*, Dr. Clarson, based solely on her review of the record, concluded that placing the children with their father was inappropriate. The Alaska Supreme Court found that "her conclusions appear to be little more than generalizations about the harms resulting from a parent's absence and provide little discussion of the particular facts of this case." *C.J.*, 18 P.3d at 1218. That court specifically noted that it did "not hold that a meeting between the expert and the parties to the termination proceeding is required in every case" as long as the expert bases her opinion on the particular circumstances in the case. *C.J.*, 18 P.3d at 1218.

¶30     In this case, although Standing looked only at the record the Department provided, she made specific conclusions about this case. She cited specific concerns about Father having no permanent home, having no steady job, having problems with alcohol, and allowing the children to spend too much time around a registered sex-offender. She was also concerned that the children seem to have been afraid of him. Clearly, Standing arrived at her conclusions based on the particular factors in this case. Thus, even under the *C.J.* rationale, she need not have met with the parties.

¶31 In *J.J.*, the same expert witness relied exclusively on the file given by the Alaska Department of Health and Human Services without meeting or speaking with the mother, her children, or the mother's counselors. The Alaska Supreme Court determined that Dr. Clarson's file was incomplete because it did not include all evidence of mother's rehabilitation. That is, J.J. had completed alcoholism treatment and had remained sober until trial. *J.J.*, 33 P.3d at 10. Those defects in Dr. Clarson's review fatally undermined her conclusions and the probity of her testimony. In both *C.J.* and *J.J.*, the Alaska Supreme Court held that the evidence of rehabilitation outweighed Dr. Clarson's testimony based on incomplete information. *J.J.*, 33 P.3d at 11; *C.J.*, 18 P.3d at 1219.

¶32 In a termination of custody case under ICWA, a district court need not conform its decision to a particular piece of evidence or a particular expert's report or testimony as long as a reasonable person could have found, beyond a reasonable doubt, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. Section 1912(f); *J.J.*, 38 P.3d at 11; *In re Marriage of McKenna*, 2000 MT 58, ¶¶ 17-18, 299 Mont. 13, ¶¶ 17-18, 996 P.2d 386, ¶¶ 17-18. Standing considered the particular facts in this case and applied Indian Cultural norms before concluding that Father's continued custody of the children was likely to result in serious emotional or physical damage to them. Further, based on the record, a reasonable person could have found beyond a reasonable doubt that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. Thus, we affirm the District Court.

11

# III

¶33    Father argues that the District Court abused its discretion in failing to grant Father's request for a six-month extension of temporary legal custody because of the dearth of evidence showing active efforts by the Department and because the ICWA expert based her testimony solely on the record without interviewing the children or the Father. The extra six months, Father believes, would have given the Department time to assist Father in meeting his goals, given the District Court a better perspective on his parenting ability, and given the ICWA expert sufficient time to interview Father and the children. Further, because the children were not in a permanent placement, Father argues the District Court more easily could have extended temporary legal custody "without interrupting an established relationship." *J.J.*, 38 P.3d at 10.

¶34    In refusing to extend temporary custody, the District Court did not abuse its discretion. The Department had already provided active efforts and did not need more time to assist father in attaining his goals. ICWA does not require interviews with the Father and children. Based on the record, the District Court had an accurate perspective on Father's parenting abilities, and the refusal to extend the temporary placement did not make the District Court's decision any less reasonable. The District Court did not abuse its discretion by denying Father's request for a continuance of temporary legal custody.

¶35    We affirm.

/S/ W. WILLIAM LEAPHART

12

We Concur:


/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ JAMES C. NELSON
/S/ JIM RICE