DA 24-0514

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 98

IN THE MATTER OF:

D.L.L. and J.T.L.,

Youths in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause Nos. ADN-21-198 and ADN-21-199
Honorable David Grubich, Presiding Judge

COUNSEL OF RECORD:

For Appellant Mother:

Abby Shea, Hathaway Law Group, Missoula, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Cori Losing, Assistant Attorney General, Helena, Montana

Joshua A. Racki, Cascade County Attorney, Valerie Winfield, Deputy County Attorney, Great Falls, Montana

Submitted on Briefs:  April 9, 2025

Decided:  May 13, 2025

Filed:

_____
Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1 E.C.-L. (Mother) appeals the August 2024 order of the Montana Eighth Judicial District Court, Cascade County, terminating her parental rights to J.T.L. and D.L.L.

¶2 We address the following restated issues:

1. *Did the District Court erroneously conclude the Department made "active efforts" under ICWA when placing the children with non-kinship, non-Native American foster parents and enrolling J.T.L in a private Christian school?*

2. *Did the District Court abuse its discretion in terminating Mother's parental rights?*

We affirm.

### PROCEDURAL AND FACTUAL BACKGROUND

¶3 In September 2021, the Montana Department of Public Health and Human Services (Department) removed J.T.L. (born April 2016) and D.L.L. (born December 2018) from their mother and father's care based on admitted illicit drug use and the condition of the family home.[1] This was the fourth time the Department removed J.T.L. and the third removal of D.L.L. since 2016.[2]

¶4 In February 2022, the children were enrolled in the Little Shell Tribe of Chippewa Indians. The Department notified the Tribe of the proceedings. In March 2022, the Department petitioned to adjudicate the children as youths in need of care. After a two-day

---

[1] Mother also reported to police that J.T.L. disclosed possible sexual abuse by his father, B.L. (Father). However, she later pleaded guilty when charged with false reporting. Father filed a separate appeal in this matter, which has been dismissed pursuant to *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967), and § 46-8-103(2), MCA.

[2] The first removal was from October 2016 to January 2018; the second was from September 2018 to February 2020; and the third was from May 2020 to August 2021.

contested hearing in July 2022, the District Court adjudicated J.T.L. and D.L.L. youths in need of care and granted the Department temporary legal custody. In August 2022, the District Court ordered Mother to complete a treatment plan requiring her to address and resolve substance use, mental health, safe parenting, and housing instability issues.

¶5 In October 2023, the Department sought termination of Mother's parental rights when she failed to complete her court-ordered treatment plan successfully. The District Court held a two-day hearing in July 2024, after which it terminated Mother's parental rights to J.T.L. and D.L.L. Mother timely appeals.

**STANDARD OF REVIEW**

¶6 We review a district court decision to terminate parental rights for an abuse of discretion under the applicable standards of Title 41, chapter 3, MCA, and the federal Indian Child Welfare Act (ICWA), Title 25, chapter 21, U.S.C. *In re L.D.*, 2018 MT 60, ¶ 10, 391 Mont. 33, 414 P.3d 768. "In this context, a court errs and abuses its discretion if it terminates parental rights based on clearly erroneous findings of fact, erroneous conclusions of law, or otherwise acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re L.D.*, ¶ 10 (citation and internal punctuation omitted). Findings of fact are clearly erroneous if not supported by substantial evidence, the court misapprehended the effect of the evidence, or we are firmly convinced a mistake was made. *In re D.H.*, 2001 MT 200, ¶ 14, 306 Mont. 278, 33 P.3d 616. We review lower court conclusions of law for correctness. *In re L.H.*, 2021 MT 199, ¶ 8, 405 Mont. 173, 492 P.3d 1218.

**DISCUSSION**

¶7     1. *Did the District Court erroneously conclude the Department made "active efforts" under ICWA when placing the children with non-kinship, non-Native American foster parents and enrolling J.T.L in a private Christian school?*

¶8     "Enacted in 1978 to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families, ICWA imposes heightened federal standards for the removal of Indian children from Indian families." *In re L.H.*, ¶ 11 (citing 25 U.S.C. §§ 1902, 1911, 1912(d)-(f)).  "At the core of ICWA is the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected."  *In re L.D.*, ¶ 12 (citing *Mississippi Band of Choctaw Indians v. Holyfield, et al.*, 490 U.S. 30, 32 n.24, 109 S. Ct. 1597, 1609 (1989)).

¶9     A district court may order termination of the parent-child legal relationship upon clear and convincing evidence that the child was adjudicated a youth in need of care, the parent failed to comply with an appropriate treatment plan, and the conduct or condition rendering the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA.  "When considering any of the relevant factors in determining the likelihood of that change, the court must give primary consideration to the physical, mental, and emotional conditions and needs of the child."  *In re A.B.*, 2020 MT 64, ¶ 24, 399 Mont. 219, 460 P.3d 405 (citing § 41-3-609(3), MCA).

¶10    Under ICWA, evidence beyond a reasonable doubt must support the § 41-3-609(1)(f), MCA, termination criteria.  *In re K.L.N.*, 2021 MT 56, ¶ 19, 403 Mont. 342, 482 P.3d 650.  In addition to the statutory termination criteria, ICWA requires proof beyond a reasonable doubt, as established by a qualified expert witness's testimony, that

4

"the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child." *In re K.L.N.*, ¶ 19 (citing 25 U.S.C. § 1912(f) (internal punctuation omitted)). Finally, ICWA requires "proof beyond a reasonable doubt that a state seeking termination of parental rights to an Indian child has made 'active efforts' to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful." *In re B.Y.*, 2018 MT 309, ¶¶ 8-9, 393 Mont. 530, 432 P.3d 129 (citing 25 U.S.C. § 1912(d)).

> Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. . . . To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case.

*In re B.Y.*, ¶ 9 (quoting 25 CFR 23.2 and listing examples of "active efforts," including "focus[ing] on safe reunification as the most desirable goal"). *See also In re T.W.F.*, 2009 MT 207, ¶ 27, 351 Mont. 233, 210 P.3d 174 (citing *In re A.N.*, 2005 MT 19, ¶ 23, 325 Mont. 379, 106 P.3d 556).

¶11 While the Department must make "active" reunification efforts under ICWA, a parent also has "an obligation to avail herself of services arranged or referred by the Department and engage with the Department to successfully complete her treatment plan." *In re R.J.F.*, 2019 MT 113, ¶ 38, 395 Mont. 454, 443 P.3d 387; *In re Custody and Parental Rights of D.A.*, 2008 MT 247, ¶ 22, 344 Mont. 513, 189 P.3d 631.

**A. Non-Kinship, Non-Native American Foster Placement.**

¶12 Mother contends that the Department failed to make "active efforts" to diligently search for ICWA-compliant placements and did not adequately justify deviating from placement guidelines. Following removal to emergency protective custody in September 2021, the Department placed the children with non-kinship, non-Native American foster parents. The children were enrolled in the Little Shell Tribe in February 2022, triggering ICWA.

¶13 ICWA provides that, when placing Indian children, "preference shall be given, in the absence of good cause to the contrary," to members of the child's extended family, members of the child's tribe, or other Indian families, among others. 25 U.S.C. § 1915(a)-(b); *accord In re A.L.D.*, 2018 MT 112, ¶¶ 10-17, 391 Mont. 273, 417 P.3d 342.

¶14 During the youth in need of care proceedings, B.L. (Father) filed a motion to place the children with him, which Mother supported. She believed Father was the preferred placement under ICWA. The Department, however, disagreed that Father was a safe placement for the children based on his unwillingness to keep them away from family members the Department considered unsafe, including Mother's brother, who both parents reported had sexually abused an immediate family member, and a nephew who had previously sexually assaulted J.T.L. Finally, the Department was concerned that Father continued to allow Mother into the home, despite her ongoing drug use and mental health issues.

¶15 At the July 2022 adjudication hearing, the Department's ongoing caseworker (since October 2020) testified that: (1) she consulted the Little Shell Tribe regarding the

non-kinship, non-Native American foster placement; (2) the Tribe did not object; and (3) the Tribe offered no alternative kinship or Native American foster placements. The District Court concluded that the Department diligently sought ICWA-preferred placements to no avail and placement with Father was not a safe alternative.

¶16 At various times throughout the proceedings, both parents named other possible kinship placements, including Mother's brother, sister (A.C.), half-sister (B.K.), cousin (L.G.), and another family member (S.C.).[3] The Department opposed these placements, citing various safety concerns, including Mother's brother's history of child sex abuse, that Mother's sister was living in the home when the children were removed but did not report Mother's ongoing drug use, and that S.C. was involved with drugs. At the July 2024 termination proceeding, the caseworker testified she was unable to locate or contact B.K. and that L.G. did not qualify as a placement, nor was she eligible for a Department exception, based on her history with the Department and recent concerns.[4] The caseworker testified that Father did not recommend any of his family members as potential placements.[5]

¶17 At the termination hearing, the caseworker testified again that, since the children became enrolled in the Little Shell Tribe, she sought guidance from the Tribe about

---

[3] Mother also suggested family member J.E., but the Department caseworker testified that J.E. was living in a nursing home and unable to care for the children.

[4] Although the questioning and testimony regarding L.G. was vague, when discussing L.G.'s "history" and the Department's "concerns," Mother's counsel referenced "previous substantiations."

[5] The Department caseworker conducted two Seneca searches for possible kinship placements, in 2021 and 2022.

ICWA-preferred foster placements. She also reached out to the Blackfeet and Chippewa Cree tribes for familial relationships and support. Finally, she testified that none of the tribes she contacted had foster placements available. At one hearing, the caseworker explained that, "in speaking and meeting with a variety of tribes, they themselves are really struggling with finding placements for children."

¶18 The record reveals that the Department made "active efforts" to place J.T.L. and D.L.L. with an ICWA-preferred kinship or Native American foster family. However, the Little Shell Tribe had no kinship or Native American foster placements available and the parents' recommended kinship placements were not qualified due to safety concerns. We hold that the District Court correctly concluded the Department made "active efforts" under ICWA when placing J.T.L. and D.L.L. in foster care.

## B. Enrollment in a Private Christian School.

¶19 Mother also contends the Department failed to make "active efforts" to support the children's Native American cultural connections. In September 2023, after the Department enrolled J.T.L in Foothills Community Christian School for the second-grade school year, Mother filed a motion to compel the Department to return him to the Great Falls public school system.[6] She likened the Department's actions to "historical assimilation practices." The Department answered that J.T.L. struggled at public school and was bullied by his peers.

---

[6] D.L.L. was not yet in school. The record indicates that J.T.L.'s foster siblings also attended Foothills.

8

¶20 At the March 2024 hearing on Mother's motion, the Department caseworker testified that she had been in contact with the Little Shell Tribe since Spring 2022, shortly after the children were enrolled. The caseworker consulted the Tribe and the State's ICWA specialist about supporting the children's cultural engagement through education and activities, and from September 2023 through February 2024, was in contact with the Tribe's ICWA specialist on a monthly and sometimes weekly basis. She conferred with J.T.L.'s therapist and principal regarding emerging concerns about his performance in public school. Finally, she attempted to address and resolve these concerns with both parents in July and August 2023, but the meetings were unproductive due to the parents' noncooperation.

¶21 The caseworker encouraged the children's foster parents to engage them in cultural activities, including those available through the Little Shell Tribe. During direct examination on the issue of cultural engagement, the Department's counsel asked the caseworker if J.T.L. "participate[d] in basketball" and "ha[d] a bow" and whether the foster placements engaged the children in "outdoor activities," including "visit[ing] Yellowstone." The caseworker answered "yes" to all. However, the qualified ICWA expert testified that this level of cultural engagement was insufficient because the children needed personal interaction with their Native American peers.[7]

---

[7] At the July 2024 termination hearing, the caseworker added that she had since connected the children with the Little Shell Tribe, from which they received a care-package including books and stories.

¶22 The caseworker was concerned, however, that Mother's family members' behavior at community cultural events created a safety risk for the children. The caseworker stated ongoing concerns about the children being around Mother's brother, who she said was "a danger to the children and to the community," and described one incident where Mother's niece became so volatile in the presence of the children and placements at Sam's Club that the police were called. She said these safety concerns limited the placements' ability to bring the children to community cultural events Mother's family also attended.[8]

¶23 Finally, the caseworker denied Mother's claim that Foothills Christian School offered no Native American educational programming. Instead, the school offered academics specific to Native American cultural beliefs and traditions and supported children in exploring their individual beliefs. The guardian ad litem also testified that J.T.L. was enjoying being at Foothills, making friends, and responding positively to more stability after spending almost 70% of his life in foster care; and that J.T.L., unsolicited, told her he was happier at Foothills than his old school and wanted to stay there. The youths' attorney also confirmed that J.T.L. wanted to stay at Foothills. The Little Shell Tribe's ICWA expert opined that public school was the better choice, though she conceded she had only read the case file and briefing and not seen J.T.L.'s school records. The Little

---

[8] In the summer of 2023, the Department did permit Mother to take the children to a powwow, under its supervision, but only because she had obtained an order of protection against her brother.

Shell Tribe, through counsel, advocated for returning J.T.L. to public school, given the Tribe's involvement with cultural programming in the public school system.[9]

¶24 In denying Mother's motion, the District Court ultimately concluded that, although the public school system provided greater cultural educational opportunities than Foothills, J.T.L. did not participate in them and his best interests were currently served at Foothills, where he wanted to be. Moreover, Mother presented no evidence that Foothills was an equivalent modern-day boarding school or that its curriculum would harm J.T.L.'s Native American identity. The court concluded the Department met its ICWA obligations to make "active efforts" by involving as many parties as possible in decision-making and ensuring J.T.L.'s educational placement was consistent with ICWA's goals and on balance with his educational goals, academic performance, and emotional and physical health—i.e., J.T.L's overall best interests. Accordingly, the court declined to order J.T.L. returned to public school for that school year, but instructed the parties to monitor J.T.L.'s exposure to Native American cultural education at Foothills and participation in cultural activities, and noted it would reconsider the issue on motion for the next school year.

¶25 We agree with the ICWA expert that the children need to engage personally with Native American peers, and that playing basketball, having a bow, and visiting Yellowstone are insufficient cultural engagements. However, the Department satisfied its "active efforts" obligations under ICWA because it established that, from the time the children were enrolled in the Little Shell Tribe, it consulted with tribal members and sought

---

[9] When the Department first reached out to the Little Shell Tribe regarding the Christian school placement, the Tribe did not take a position on the issue.

11

tribal, outside, and family input in decision-making for the children's benefit. While the record shows Foothills Christian School did not have as many opportunities for exposure to Native American culture as the Great Falls public schools, it had some. Moreover, although Mother's family was hostile to the foster placements in public settings, the Department encouraged the foster family to supplement the children's exposure to their Native American culture, while still keeping themselves and the children safe. *See In re B.Y.*, ¶ 9 (quoting 25 CFR 23.2 ("[a]ctive efforts are to be tailored to the facts and circumstances of the case")). We hold the District Court correctly concluded the Department made "active efforts" under ICWA before enrolling J.T.L. in a private Christian school.

¶26    2. *Did the District Court abuse its discretion in terminating Mother's parental rights?*

¶27    Mother contends that guardianship, not termination of her parental rights, was in the children's best interests. She acknowledges that § 41-3-604(1), MCA, creates a rebuttable presumption that termination is in the children's best interest when they have been in State custody for 15 of the most recent 22 months, but argues she overcame that presumption with compelling evidence that guardianship was the preferred permanency option.

¶28    At the July 2024 termination hearing, the Department caseworker testified that, although Mother made some progress since August 2022, Mother's success within a reasonable time was unlikely because she could not maintain successful parenting and failed all aspects of her treatment plan. After almost two years, the caseworker had

12

exhausted all means of engaging Mother in substance use and mental health treatment and was "out of ideas on how to help her anymore."

¶29 Mother failed the parenting aspect of her plan because, although she participated in parenting classes and visitation, she and Father stopped attending visitation with the children after relapsing in late 2023. On J.T.L.'s request, the Department eventually discontinued visitation in February 2024 and conditioned restarting it on Mother's maintaining 30 days of sobriety. Mother was not willing to drug test. Mother failed the mental health aspect because, although she had prolonged periods of engaging in treatment, she was unable to achieve sustained mental health stability. Mother failed the chemical dependency aspect of her plan because, although she engaged at times with treatment providers, her participation was inconsistent and she revoked releases, largely self-reported, often resisted treatment, and suffered numerous relapses. In addition, Mother reported to the Department in November and December 2023 she was actively using methamphetamine, fentanyl, and alcohol. She required inpatient treatment numerous times but attended only once and self-discharged after seven days. Mother did not follow through with Department attempts to coordinate further treatment. Finally, Mother failed the housing aspect of her plan because she was unable to secure permanent, safe housing. After living mostly in a women's shelter since 2021, she was suspended indefinitely for failing to follow rules. She reported that, after recently moving back in with Father, they were evicted in May 2024 and, as of July 2024, were living on the streets.

¶30 The Little Shell Tribe's ICWA expert agreed the Department had made active efforts to reunify the children with their parents, though with mixed success. The ICWA

13

expert also opined that continued custody by Mother would likely result in serious emotional or physical damage to the children because Mother continued to struggle with drug addiction and was currently homeless.

¶31 The ICWA expert also believed guardianship is preferred over termination of parental rights and reunification of J.T.L. and D.L.L. with their parents was in the children's best interests "from a cultural perspective," but conceded theirs was "a very complicated situation." The children's counsel also supported guardianship over termination, based on J.T.L. stating he wanted to be back with his parents someday. The Department caseworker, on the other hand, testified that guardianship, unlike adoption, would not provide the children permanency. The guardian ad litem agreed termination was in the children's best interests. The caseworker explained that all Mother would have to do is petition to dissolve the guardianship, and the parties "would be right back . . . here doing the same thing."

¶32 The District Court first noted J.T.L. and D.L.L. had been in protective custody since September 2021 (almost 34 months), and therefore termination of parental rights was presumptively in their best interests under § 41-3-604(1), MCA. The court then found beyond a reasonable doubt that: (1) J.T.L. and D.L.L. were adjudicated youths in need of care; (2) Mother failed all aspects of her treatment plan; (3) given the length of Department involvement with J.T.L. and D.L.L. (almost their entire lives), it was unlikely that Mother's conduct or condition would change in the foreseeable future; (4) the ICWA expert believed continued parental custody would result in serious emotional or physical damage; and (5) the Department consulted with the Little Shell Tribe and made active efforts under

14

ICWA to reunify the family. Finally, considering the familial history of hostility toward the foster placements, the court found guardianship problematic. Consequently, the court found beyond a reasonable doubt that termination of parental rights was in the children's best interests.

¶33 The District Court's findings were supported by evidence beyond a reasonable doubt. The court correctly applied § 41-3-609, MCA. Finally, the court's decision to terminate Mother's parental rights was neither arbitrary nor capricious, nor did it exceed the bounds of reason resulting in a substantial injustice. Accordingly, we hold the District Court did not abuse its discretion in terminating Mother's parental rights to J.T.L. and D.L.L.

¶34 Affirmed.

/S/ KATHERINE M BIDEGARAY

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ JIM RICE

Justice Ingrid Gustafson, concurring.

¶35 Based on the standard of review—abuse of discretion—I concur with the majority's opinion that the District Court did not abuse its discretion in terminating Mother's parental rights. I write, however, to point out my concerns regarding this case and to provide information as to myths surrounding guardianships in child dependency cases.

15

¶36 Under our standard of review, I concur the District Court did not abuse its discretion in terminating Mother's parental rights. There was conflicting evidence and conflicting opinions and recommendations with the ICWA expert and the children's counsel advocating for guardianship and the Department advocating for termination. Here, the District Court distinguished *In re A.B.*, 2020 MT 64, 399 Mont. 219, 460 P.3d 405, noting there was no familial placement or record consensus in favor of guardianship and there was documented hostility toward the placements and a "resistance to the whole process" by Mother and Father. Unfortunately, the District Court did not have a crystal ball for divining the future and made the choice by weighing the information it had. Accordingly, the District Court found guardianship problematic and ultimately not in the children's best interests.

¶37 I write though as I am concerned with the caseworker's perception that guardianships, unlike adoptions, do not provide permanency and that all Mother would have to do is petition to dissolve the guardianship and the parties "would be right back" in court doing the same thing—implying the process of terminating the guardianship and regaining custody would not involve Mother having to address the parenting deficits which initiated this case and which she exhibited throughout it. With better understanding as to the process for terminating a guardianship brought about through a child welfare case, the caseworker here would be better equipped to not only provide the court better information, but also more able to work with parents and foster placements to accomplish guardianships that may very well reduce hostility toward the placement and better suit the child's need to maintain connection with the child's family of origin and, as noted by the ICWA expert,

16

where Indian children are involved, to accomplish a guardianship which is better for the child "[f]rom a cultural perspective[.]"

¶38 There is little debate that children generally do better when they maintain regular, ongoing contact with their family of origin. Montana's own child dependency policy supports this. It is the policy of the state of Montana to "provide for the protection of children whose health and welfare are or may be adversely affected and further threatened by the conduct of those responsible for the children's care and protection" and to "achieve these purposes in a family environment and *preserve the unity and welfare of the family whenever possible*[.]" Section 41-3-101(1)(a)-(b), MCA (emphasis added). The loss a child experiences when separated from a parent is profound and can last into adulthood. *See* Vivek Sankaran, Christopher Church & Monique Mitchell, *A Cure Worse Than the Disease? The Impact of Removal on Children and Their Families*, 102 Marq. L. Rev. 1161, 1165-69 (2019); *see also* Erin Sugrue, Alia Innovations, *Evidence Base for Avoiding Family Separation in Child Welfare Practice: An Analysis of Current Research – July 2019* (2019), https://perma.cc/CU4D-JTM6. The factor most closely associated with positive outcomes for children is when they remain safely connected to their families. Logically then, it is counterproductive to terminate a parent's rights when such does not increase the overall safety or stability of the child and is not in the best interest of the child's family.

¶39 Montana has long included guardianship as a permanency option, which advances its overarching policy of preserving the unity and welfare of the family in child dependency

17

cases. Sections 41-3-444, -445(8), MCA.[1] As partially demonstrated in this case, a variety of myths and misconceptions exist regarding the safety, permanency, and effectiveness of guardianships—including the myths that guardianship can be easily reversed and are not permanent with higher re-entry rates in the child welfare system.

¶40 Research findings from subsidized guardianship (SG) demonstration projects across eleven states indicated there were "significant boosts in net permanency rates"; "reunification rates were not significantly impacted by the availability of SG"; "the availability of SG decreased length of time in out-of-home placement"; "children placed with guardians were at least as safe as or safer from repeat maltreatment than children in other permanent settings, particularly reunification"; "children with access to SG experience comparable rates of placement stability"; "there were no significant differences in the proportion of experimental and control group children that re-entered foster care after exiting to permanency"; and "children in SG arrangements fare as well or better than children in foster care or other permanent settings with respect to factors such as school performance and engagement in risky behaviors." Children's Bureau, U.S. Dep't of Health

---

[1] With the purpose to increase permanent placement options, twenty-six years ago, the Legislature authorized guardianship as a permanency option to provide an alternative for children for whom there is no compelling reason to terminate parental rights, yet cannot live at home; provide for situations where a child has strong bonds with the parent or other reasons when parental rights are not terminated, but permanent placement with the parents is not possible; allow children to stay in families when relationships have been formed; look at placement through the eyes of a child; and to ensure those becoming permanent guardians are committed to a long-term relationship with the child. *See* 1999 Mont. Laws ch. 428 (H.B. 180, initially codified at § 41-3-421, MCA, and now renumbered as § 41-3-444, MCA.) A more thorough history of guardianships in Montana can be found in *In re A.B.*, ¶¶ 45-46 (Gustafson, J., concurring).

18

& Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* i-ii (2011), https://perma.cc/CNC6-CYER.

¶41 Resoundingly, the research suggests permanency is more closely tied to the child's relationship with his or her placement than to an ultimate legal designation. Children's Bureau, U.S. Dep't of Health & Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* 18-20 (2011), https://perma.cc/CNC6-CYER. "[C]hildren in relative kinship care or relative guardianship experience improved outcomes over children placed in non-kinship foster care. These include greater placement stability, fewer school changes, higher levels of permanency, and better behavioral and mental health outcomes." Lydia Killos, et al., *A National Analysis of Guardianship Assistance Policy and Implementation*, Casey Family Programs (2018), https://perma.cc/5C5H-UAQD.

¶42 In Montana, the Department has not demonstrated outcomes for children exiting to guardianship to be any worse than those exiting to adoption. In fact, evidence from Montana demonstrated children who exited care to adoption are not safer nor do they have better well-being outcomes than children who exited care to guardianship. James Bell Assocs., Children's Bureau, U.S. Dep't of Health & Human Servs., *Profiles of the Title IV-E Child Welfare Waiver Demonstration Projects: Volume 1: Demonstrations Actives between Federal Fiscal Years 1996 and 2012* 113 (2013), https://perma.cc/5KEU-5BNF.

¶43 Unfortunately, as occurred in this case, CPS workers continue to express with some frequency the idea that guardianships are easily undone merely by a parent filing a request to terminate the guardianship after dismissal of the child dependency case. This

characterization is inaccurate. The incidence of termination of guardianships is very rare, and the incidence of termination of guardianships not supported by the Department are even more rare.

¶44 Guardianships granted pursuant to § 41-3-444, MCA, are not easily revoked. A parent would have to file a petition to revoke the guardianship. The court must hold a hearing on the request and the Department, the guardian, and other persons directly interested in the welfare of the child must be provided notice of the hearing. Section 41-3-444(6), MCA. The parent petitioner would then have to establish at hearing that it is in the child's best interest to revoke the guardianship. This, by its nature, would require not only that the parent petitioner demonstrate he or she had successfully addressed the condition rendering him or her unable to parent when the guardianship was established, but also that, at the time of the hearing, it is in the child's best interests to revoke the guardianship and restore custody to the parent rather than to the Department. Section 41-3-444, MCA. If the parent is able to meet this high evidentiary hurdle, why would the Department desire the child to be maintained in a situation that no longer meets his or her best interests?

/S/ INGRID GUSTAFSON