984 A.2d 549 (2009)
In re T.C., S.C., and H.C., Minor Children.
Appeal of R.C., Natural Father, Appellant.
No. 2017 MDA 2008.
Superior Court of Pennsylvania.
Argued August 19, 2009.
Filed November 18, 2009.
Stephanie E. Lombardo, Williamsport, for appellant.
Charles F. Greevy, III, Williamsport, for Lycoming County Children and Youth, appellee.
John P. Pietrovito, Muncy, Guardian Ad Litem.
BEFORE: GANTMAN, FREEDBERG, JJ. and McEWEN, P.J.E.
*550 OPINION BY FREEDBERG, J.:
¶ 1 R.C. ("Father") appeals from the order of the Court of Common Pleas of Lycoming County involuntarily terminating his parental rights to T.C., S.C., and H.C., pursuant to the Indian Child Welfare Act ("ICWA"), 25 U.S.C. § 1912.[1] We affirm.
¶ 2 The trial court set forth the facts and procedural history as follows, in relevant part:
T.C.[, a male,] was born on February 6, 1999, S.C.[, a female,] on December 21, 2000, and H.C.[, a male,] on February 16, 2004. All three children are of the Native American race as [Father] is a member of a federally recognized tribe known as the Lac-Courte-Oreilles Band of Lake Superior Chippewa Indians. [Father] was not married at the time of each of the children's birth.
On February 13, 2006, a dependency hearing was held....[[2]] At that time, the children were declared dependent with placement in their parents' home. A review hearing was held on August 28, 2006[,] before the Honorable Richard A. Gray, who reaffirmed dependency and continued placement in [Father's] home. On November 8, 2006, the police were called to the home and reported that [Father] and his paramour ... were heavily intoxicated. The police were called again on November 16, 2006; the police report indicated [Father] was heavily intoxicated and was charged with simple assault, making terroristic threats, and harassment. On December 11, 2006[,] and December 20, 2006, a review hearing was held before the Honorable Kenneth D. Brown, who reaffirmed dependency and ordered the children be placed in an approved foster home. On December 20, 2006, [Lycoming County Children and Youth Services] placed the children with [Foster Parents].
On May 14, 2007, a review hearing was held before th[e][c]ourt, which reaffirmed dependency and ordered all the children to remain in the resource home together. A review hearing was held before the Honorable Dudley N. Anderson on November 1, 2007, who found the children should continue in placement in the resource home and [Father] was directed to attend drug and alcohol counseling. On February 8, 2008, the police were called to [Father's] home because Mother had slashed [Father's] face. When Corporal Ottaviano of the South Williamsport Police Department arrived, he found [Father] to be highly intoxicated and refusing treatment. A review hearing was held on March 11, 2008 before the Honorable William S. Keiser, in which he revoked the order for unsupervised visitation in light of the February [8], 2008 incident.
On April 24, 2008, [Lycoming County Children and Youth Services] filed the instant [p]etition for [i]nvoluntary [t]ermination of [p]arental [r]ights....
Trial Court Opinion, 10/14/2008, at 1-2 (original footnotes omitted). Following a hearing on the petition on September 22, 2008, September 23, 2008, and September 25, 2008, the trial court involuntarily terminated *551 Father's parental rights.[3] This timely appeal followed. Father was ordered to file a concise statement of errors complained of on appeal pursuant to Pa. R.A.P. 1925(b). Father filed his statement, and the trial court then issued its Opinion.
¶ 3 Father raises the following issues on appeal, both of which relate to CYS's burden of proof under the ICWA:
1. Whether the lower court erred in terminating [Father's] parental rights where the expert testimony introduced by the Lycoming County Children and Youth Services did not conclusively satisfy the standard set forth in the Indian Child Welfare Act?
2. Whether the lower court erred in terminating [Father's] parental rights where the Lycoming County Children and Youth Services did not meet its burden under [the] Indian Child Welfare Act of proving beyond reasonable doubt termination was justified?
Father's brief at 6.
¶ 4 The scope and standard of review in this case are as follows:
In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.
In re L.M., 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted).
We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.
In re M.G., 855 A.2d 68, 73-74 (Pa.Super.2004) (citations omitted). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa.Super.2003).
¶ 5 In addition, pursuant to the ICWA, we will affirm the termination order if a reasonable fact-finder could conclude beyond a reasonable doubt "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f); see also In re A.N. and M.N., 325 Mont. 379, 106 P.3d 556, 560 (2005).[4]
¶ 6 Instantly, the trial court terminated Father's parental rights pursuant to the following provision of the ICWA:
§ 1912. Pending court proceedings
...
(d) Remedial services and rehabilitative programs; preventive measures. Any *552 party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
...
(f) Parental rights termination orders; evidence; determination of damage to child. No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
25 U.S.C. § 1912(d), (f).[5]
¶ 7 In terminating Father's parental rights, the trial court found as follows:
[t]h[e] [c]ourt finds the evidence does show beyond a reasonable doubt that to return the children to [Father] is likely to result in serous emotional or physical damage to the children. While [Father] has made great strides in the last seven months to remain sober, he admits to being an alcoholic for over twenty-five years. The [c]ourt finds that seven months is a relatively short period of time to be sober, the possibility of relapse is great, and that the [c]hildren should not have to wait any longer for permanency due to [Father's] alcohol issues. [Father] has not been honest about his alcohol usage while on supervision in an attempt to avoid jail and out of fear of losing his [children].[[6]] The [c]ourt also notes [Father] was on a SCRAM[[7]] unit during the majority of his time of sobriety.[[8]] Further, [Father] has made poor choices in relationships which have resulted in domestic violence issues. [Father] seems to be a good father to his older daughter; however, she admits one of the reasons she is staying with her father is that her mother cannot always buy her the things she needs and [Father] is able to do so.
The [c]ourt finds the children do not appear to have any real emotional connection with [Father]. The testimony of several witnesses show the children have flourished in their new environment. The [c]ourt feels that removal of the children from the [foster parents'] home after nearly twenty-two months would cause even more trauma to the children. Therefore, the [c]ourt finds [CYS] has met its burden as determined by the ICWA. As such, the [c]ourt is satisfied that termination of [Father's] parental rights will be in the best interests of the children.
Trial Court Opinion, 10/14/2008, at 11-12. Competent evidence supports the trial court's findings.
¶ 8 In its opinion accompanying the subject order, the trial court thoroughly set *553 forth the testimony of the witnesses during the termination hearing. The testimony established that, following the February 2008, domestic violence incident, during which Father's face was slashed by Mother, Father became serious about sobriety for the first time since the children were declared dependent. There is no evidence that Father consumed alcohol from the evening of the February incident to the time of the termination hearing, that is, a period of approximately seven months. However, in violation of his probation, Father failed to report the February, 2008, incident to his probation officer.[9] N.T., 9/25/2008, at 28. In addition, Father testified during the termination hearing that he only had "a couple of beers" immediately following the domestic dispute. Id. at 83, 110. In contrast, during a previous hearing, Corporal John Ottaviano testified that Father was highly intoxicated on the night of the incident. Id. at 110. Further, the police report indicates Father admitted drinking prior to the domestic dispute, but, during the termination hearing, Father denied drinking prior to the dispute. Id. at 115-116. Based on this evidence, we will not disturb the trial court's credibility findings against Father. See In re M.G., supra.
¶ 9 Moreover, the testimonial evidence reveals that, by the time of the termination hearing, the children had been placed together with the same foster family for a period of twenty-one months. N.T., 9/23/2008, at 125. The foster mother testified she and her husband wish to adopt the children. Id. at 133-134. The evidence establishes that the children share a significant bond with the foster parents, and that they do not share a strong bond with Father. Id. at 103-104, 123. Further, the children are thriving in the foster parents' care. The foster mother testified that H.C. was two and one-half years old when placed with her, and that he was mostly non-verbal. Id. at 125. He had temper tantrums because of his inability to communicate. Id. The foster parents correctly concluded H.C. had hearing deficiencies. H.C. has had tubes placed in his ears to assist his hearing. Id. at 127-128. T.C. and S.C. had dental needs when they were first placed with the foster parents. Id. at 128. In addition, when they were first placed with the foster parents, T.C. acted like a parent to S.C. and H.C., and S.C. demonstrated anger problems. Id. at 125-126. All of the children have improved significantly while in the care of the foster parents. Id. at 15, 115. Further, the children's performance in school has improved since being placed with the foster parents. Id. at 126-127. Judy Deacon, the Court Appointed Special Advocate ("CASA") for the children, testified as follows:
I saw pretty quick changes after the children went to the resource home. [E]ven as far as their relationship with myself[,] they were just much more relaxed, they were more engaging. They were able to communicate and eventually they started becoming more demonstrative in giving hugs and kisses and being able to emotionally connect with someone. There were also improvements in their ... behavior, in their performance in school. Just in general they became much happier, much more comfortable and confident in what their day-to-day life was going to be.
They continue to ... do superbly in their resource home. [A]ll three of *554 them have grown significantly. [H.C.] is speaking in full sentences....
[S.C.] has really blossomed socially. She is participating as a c[h]eer leader now. She's gained more confidence.... [T.C.] is doing very well ... focusing on school and ... extracurricular activities[,] and I see them just naturally being loving with one another and with other people. I see them ... easily engaging with other people and ... overall quite healthy.
Id. at 115-116.
¶ 10 Finally, Bruce Anderson, a licensed psychologist, who performed a psychological evaluation on Father, and interviewed the children and the foster parents, opined that any change in placement "would be extremely traumatic" for the children. Id. at 95. He opined that it is in the children's best interest to remain with the foster parents. Id. at 98.
¶ 11 Father argues that the testimony of the expert witness, Luann Kolumbus, presented by Lycoming County Children and Youth Services ("CYS"), was insufficient pursuant to the standard set forth in the ICWA. Specifically, he argues it was insufficient because she (1) lacked sufficient information to make an informed opinion and (2) deferred to the recommendations of CYS. Pursuant to 25 U.S.C. § 1912(f), Father argues that this expert's testimony did not prove beyond a reasonable doubt that placement with Father was likely to result in serious physical or emotional harm. Upon careful review, we conclude Father's claim lacks merit.
¶ 12 The ICWA requires the evidence for terminating parental custody to "include testimony of qualified expert witnesses that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Section 1912(f); In re A.N. and M.N., 106 P.3d at 561. However, a trial court "need not conform its decision to a particular piece of evidence or a particular expert's report or testimony as long as a reasonable person could have found beyond a reasonable doubt, that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child." In re A.N. and M.N., 106 P.3d at 562.
¶ 13 Kolumbus testified that she is a member of Lac-Courte-Oreilles Band of Lake Superior Chippewa Indians. N.T., 9/23/2008, at 24. She is the director of the Indian Child Welfare agency for the Lac-Courte Tribe, and her duties include investigating cases of abuse and neglect of Native American children on the Lac-Courte reservation. Id. at 25. In addition, the agency intervenes in ICWA proceedings. Id. Kolumbus explained that, in general, the Indian Child Welfare agency inquires into the best interest of a child, and that a child's length of placement and need for permanency is relevant in this regard. Id. at 29-31. In addition, she testified that, when the Indian Child Welfare agency intervenes in an ICWA proceeding, it has to rely on information from the CYS caseworkers. Id. at 31-32.
¶ 14 With respect to the instant matter, Kolumbus testified she supervised a caseworker from the Indian Child Welfare agency who was assigned to the case. Id. at 25. Kolumbus opined that CYS made an active effort to provide remedial services and rehabilitative programs to prevent the break-up of this family. Id. at 27-28. She testified as follows regarding termination of Father's parental rights:
[It] has been almost two years, and ... I would go with the recommendation of [CYS] workers because they are there. They know the case better than we do. We will rely on their recommendation *555 ... because we are all looking at what's in the best interest of these [children].
Id. at 34. Further, with respect to the opinion of Bruce Anderson, the licensed psychologist, that any change in placement "would be extremely traumatic" for the children, Kolumbus testified:
[W]e also do ... the psychological evaluations.... I'm aware of bonding. I'm aware of the other issues that affect children that are placed and placed and placed and the traumatic injury it causes to them.... I think that if the bonding has occurred and ... if they're doing well and happy ... then that's the part that we focus on to[o].
Id. at 35-36. She concluded that Father's parental rights should be terminated. Id. at 36.
¶ 15 On cross-examination, Kolumbus revealed she was unaware of Father's recent progress with his alcoholism. Id. at 37-39. Nevertheless, she did not change her recommendation for termination. She explained, "I do have faith that ... social workers[,] knowing all this information[,] and if they are still recommending the termination of parental rights ... there's some reason for it and so ... I would agree with their recommendation." Id. at 43.
¶ 16 Father relies on J.J. v. State, Dep't of Health & Social Services, 38 P.3d 7 (Alaska 2001), in arguing that the opinion of Kolumbus was insufficient because she lacked information about Father's alleged recent sobriety. In J.J., the Supreme Court of Alaska reversed and remanded the order terminating the mother's parental rights. In that case, the expert witness for the Department of Health and Social Services relied on the case file provided by the Department in recommending termination. The Alaska Supreme Court determined that the file was incomplete because it did not include evidence of the mother's alcohol rehabilitation and her recent sobriety. As such, the Court determined the expert's conclusions lacked reliability.
¶ 17 In contrast to this case, the children in J.J. were not going to remain with their current foster parents. Therefore, the mother argued placing the children with her would be no more emotionally disruptive than placing them in another foster home. The Alaska Supreme Court determined that the trial court, instead of terminating the mother's parental rights, should have reestablished visitation for an additional time period, after which "a reasonable person could with greater confidence decide whether the State had met its burden of demonstrating the likelihood of future serious harm to the children." Id. at 10. The Court continued, "this option was available to the [trial] court without interrupting an established relationship, as the children had not been permanently placed." Id. at 10-11.
¶ 18 In this case, providing Father an additional time period to demonstrate sobriety would interrupt the children's established relationship with the foster parents, with whom they have lived for nearly three years, and who wish to adopt them.[10] Further, based on the testimonial evidence, a reasonable fact finder could conclude beyond a reasonable doubt that removing the children from the foster parents in order to reunite them with Father would cause them serious emotional harm. As such, we conclude Father's reliance on J.J. is inapposite to this matter. Kolumbus' lack of information on Father's claimed recent sobriety does not require denial of the *556 petition for termination of his parental rights.
¶ 19 We also reject Father's claim that the opinion of Kolumbus should be rejected because she relied solely on CYS's case file. Father cites C.J. v. State, Dep't of Health & Social Services, 18 P.3d 1214 (Alaska 2001) in support of his position. C.J. is a related case to J.J. In C.J., the Alaska Supreme Court determined that the conclusions of the same expert as in J.J. "appear to be little more than generalizations about the harms resulting from a parent's absence and provide little discussion of the particular facts of this case." Id. at 1218.
¶ 20 In contrast to the expert in C.J., in addition to the case file, Kolumbus was familiar with particular circumstances of this case through the caseworker from the Indian Child Welfare agency who was assigned to it. Kolumbus testified that she was updated by the caseworker whom she supervised. N.T., 9/23/2008, at 25, 27. Further, our review of the testimony reveals that Kolumbus made specific conclusions about this case. For this reason, and, because a reasonable fact finder could conclude beyond a reasonable doubt that removing the children from the foster parents in order to reunite them with Father would cause them serious emotional harm, we conclude Father's reliance on C.J. is misplaced. Therefore, we hold that the expert testimony of Kolumbus satisfied the standard set forth in Section 1912(f).
¶ 21 Lastly, Father argues the evidence presented by CYS was insufficient to show, beyond a reasonable doubt, that Father's continued custody of the children would result in serious emotional or physical harm to them. We disagree.
¶ 22 Father relies on C.J., supra, in arguing that, like C.J., he was successfully parenting his older child and had taken steps to put himself in a position to parent the subject children. Further, Father argues that, based on testimonial evidence regarding his recent sobriety, reasonable doubt existed as to whether continued custody would likely lead to the children's physical or emotional harm.
¶ 23 Father's sixteen-year-old daughter testified at the termination hearing that she had been living with Father for approximately three months.[11] N.T., 9/22/2008, at 12-13. She testified to Father's sobriety and parenting skills. The trial court found that, although Father appears to be a good parent to his older daughter, the determinative factor regarding the subject children is the serious emotional trauma they would suffer if removed from the foster parents and returned to Father. We agree with the trial court. Further, we reject Father's argument that the evidence of his recent sobriety would compel a reasonable fact finder to have reasonable doubt that returning the children to Father would cause them serious emotional harm.
¶ 24 In sum, competent evidence supports the trial court's findings. In addition, based on the evidence, a reasonable fact finder could conclude beyond a reasonable doubt that removing the children from the foster parents in order to reunite them with Father would cause them serious emotional harm.
¶ 25 Accordingly, we affirm the trial court's order terminating Father's parental rights pursuant to 25 U.S.C. § 1912(f).
¶ 26 Order AFFIRMED.
NOTES
[1] Father is a Native American. Therefore, his children are protected by the ICWA, 25 U.S.C. §§ 1901-1923. See 23 Pa.C.S.A. § 5404(a) (a child custody proceeding that pertains to a Native American child is not subject to the Pennsylvania Adoption Act but is governed by the IWCA).
[2] The reasons for the agency's involvement with the family included, inter alia, domestic violence and alcoholism. N.T., 9/23/2008, at 13.
[3] The mother of the children voluntarily relinquished her parental rights.
[4] Because no case law on point exists in this Commonwealth, we are guided in this disposition by case law from other jurisdictions.
[5] Father's issues on appeal relate only to Section 1912(f).
[6] Father was previously convicted of driving under the influence, and he was sentenced to a period of probation.
[7] Secure Continuous Remote Alcohol Monitor.
[8] Due to the domestic violence incident in February, 2008, Father was placed on a SCRAM unit, and he was tested regularly for alcohol during scheduled appointments with his probation officer. N.T., 9/25/2008, at 5, 24, 28.
[9] Father was required to report all police contacts to his probation officer. N.T., 9/25/2008, at 28.
[10] T.C. and S.C. informed Bruce Anderson that they would like to live with the foster parents until they are "grown up." H.C., because of his age and verbal limitations, was unable to communicate his desire. N.T., 9/23/2008, at 93-94.
[11] This daughter has a different mother than that of the subject children. 9/22/2008, at 5.