J-A14044-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN RE: ADOPTION OF: B.M.W. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.N. | : | No. 113 WDA 2020 |

Appeal from the Order Entered January 3, 2020
in the Court of Common Pleas of Fayette County
Orphans' Court at No(s): No. 6 ADOPT 2019

BEFORE: SHOGAN, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    FILED AUGUST 07, 2020

C.N. ("Mother") appeals from the Order denying her Petition to involuntarily terminate the parental rights of A.W. ("Father") to B.W. ("Child"), a female born in February 2015, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1),[1] in order to allow Mother's husband, N.N. ("Stepfather"), to adopt Child. We affirm.

Mother and Father are the parents of Child. Mother and Father never married. Mother resides in Mills Run, Pennsylvania, with her three daughters, E.L.N. (born in July 2013),[2] Child and C.R.N. (born in April 2018). N.T.,

_____

[1] Mother did not specifically cite to section 2511(b) in her Petition.

[2] Stepfather adopted E.L.N. sometime after December 2018, after Mother had the parental rights of E.L.N.'s biological father terminated. See N.T., 4/9/20, at 22.

4/9/20, at 10-11. After Child's birth in February 2015, Child resided with Mother, Father, and E.L.N., until April 2015, when Father disappeared for four months, until late August or the beginning of September 2015. Id. at 11-12. Mother explained that, when Father left for work one day in August 2015, he left behind all of his belongings, and did not make any phone calls to her for four months. Id. at 13. Between late August 2015 and January 2017, Father had only sporadic contact with Child. Id. at 13-14. Mother stated that Father would speak with Child either over the telephone or, infrequently, in person, but only when "he just felt like it." Id. at 14. In December 2016, when Mother's house burned down, Mother was staying at her mother's home, and Father came to live there with Mother. Id. Mother testified that she and Father would live together off and on for "just reasons." Id. Mother testified that Father did not visit Child when he was not living with Mother. Id.

On April 6, 2017, Mother and Father permanently ended their relationship. Id. at 14-15. According to Mother, between April 2017 and June 2017, Mother and Father did not reside together, and Father saw Child

only three times: April 16, 2017;[3] May 23, 2017; and June 11, 2017.[4]  Id. at 15.  Father's last visit or in-person contact with Child was on June 11, 2017, when Child was two years old.  Id.  Mother stated that, after June 11, 2017, Father would "go weeks" without contacting her.  Id.  Since June 11, 2017, Father did not give Child any Christmas cards or gifts, nor did he call her.  Id. at 20.[5]  Father had not attended or taken Child to any of her physician's or dentist's appointments since that date, nor had he provided any meals for Child, comforted Child when she was hurt, or tucked her into bed at night.  Id. at 18-19.

_____

[3] Father and his two stepbrothers visited Child for Easter on April 16, 2017. N.T., 4/9/20, at 19-20, 22-23.  Father testified during the termination hearing that after this visit, Mother told him that he could no longer enter her grandfather's property, where she lived, or she would call the police.  Id. at 39-40.

[4] The remaining two visits were at Father's home, where he resided with his grandparents.  See N.T., 4/9/20, at 27.  Mother admitted she told Father that she would not permit him to come to her residence, but she would bring Child to his residence.  Id.  On the two visits that Mother brought Child to Father's residence, Mother stayed for the entire visit.  Id.  Mother admitted having told Father she feared that he would permanently take Child, as Father had previously threatened to do so.  Id. at 28.  Additionally, Father testified at the termination hearing that Mother did not disrupt the visits; he enjoyed his visits with Child; and he would like to resume visits.  Id. at 44.

[5] Mother confirmed that she received one final telephone call form Father on September 29, 2017, and that it was the last time she or Child spoke with him.  N.T., 4/9/20, at 15-16.  At that time, Father asked Child if she wanted to go to the zoo with him, and Mother allowed Child, who was two-and-a-half years old at the time, to make her own decision.  Id. at 16, 29-30, 42.

Father spoke with Michelle Kelly, Esquire ("Attorney Kelly"), in 2017 about filing a custody action. Id. at 38. Father filed a custody Complaint regarding Child in November 2018, once he had sufficient funds to file a Complaint. Id.

Mother married Stepfather in October 2018. Id. at 11. Mother had an active child support Order against Father between 2015 and the time of the termination hearing. Id. at 9, 24.[6] In June 2018, Mother and Stepfather received an insurance card for Child, and they were aware that Father also provided health insurance for Child. Id.

Mother filed the termination Petition on February 13, 2019.[7] Therein, Mother alleged that Child had lived with her since birth; Father has not seen Child since June 11, 2017; Father had evidenced a settled purpose to relinquish his claim to Child; and Father has refused or failed to perform parental duties. On April 9, 2020, the trial court conducted a termination hearing. Michael Ford, Esquire ("Attorney Ford"), was present on behalf of

_____

[6] At the time of the termination hearing, Mother was unemployed. N.T., 4/9/20, at 11. Prior to the birth of E.L.N., Mother worked at a convenience store. Id. at 25.

[7] Mother and Stepfather first met with Attorney Kelly in November 2018, with the intent to commence termination proceedings regarding E.L.N. and Child, and for Stepfather to adopt both E.L.N. and Child. See N.T., 4/9/20, at 21-22. In early December 2018, Mother received notice that Father had filed a custody Petition regarding Child. Id.

Child.[8]  Mother appeared with her counsel, Brent Peck, Esquire ("Attorney Peck"), and testified on her own behalf.  Father appeared with his counsel, Sheryl Heid, Esquire ("Attorney Heid"), and testified on his own behalf.  Father also presented the testimony of his twin sister, K.W., ("Maternal Aunt"); his father, R.W., Jr. ("Paternal Grandfather"); and his mother, S.L. ("Paternal Grandmother").  Moreover, Father presented the testimony of Katherine Vozar ("Vozar"), a psychologist who is a licensed professional counselor with PA Professional Health Services.  See N.T., 4/9/19, at 71-72.

At the commencement of the termination hearing, Attorney Ford stated that he had met with Child, who was four years old, and found her to be a "happy little girl."  N.T., 4/9/19, at 7.  Attorney Ford stated, "the only thing of significance that [he] got out of her was that she refers to [Father] as [A., his

---

[8] Attorney Ford served as both a legal interest counsel and guardian ad litem ("GAL") for Child during the proceedings.  See In re Adoption of L.B.M., 161 A.3d 172, 174-74 (Pa. 2017) (plurality) (wherein our Supreme Court held that 23 Pa.C.S.A. § 2313(a) requires that counsel be appointed to represent the legal interests of any child in a contested involuntary termination proceeding, and defined a child's legal interest as synonymous with the child's preferred outcome); see also In re: Adoption of K.M.G., 219 A.3d 662, 669 (Pa. Super. 2019) (en banc) (holding that this Court has authority only to raise sua sponte the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation). Neither party raises a challenge to Child's representation, and there does not appear to be a conflict between Child's best interest and legal interests.  See In re D.L.B., 166 A.3d 322, 329 (Pa. Super. 2017) (stating that "separate representation would be required only if the child's best interests and legal interests were somehow in conflict.").

first name], and she refers to her mom's husband as dad." Id. At the close of the hearing, Attorney Ford reiterated that he found Child to be a "very happy little girl," and he thought that Child would be loved regardless of whether Father's parental rights were terminated. Id. at 88. Based on his observations, Attorney Ford would have no concerns if Father's parental rights remained intact. Id.

Mother testified that after Father called Child about a trip to the zoo in September 2017, "[h]e continually[,] like[,] kept blowing up [her] phone, calling it several times," so she switched her telephone over to "do not disturb" mode. Id. at 16; see also id. at 20-21 (wherein Mother testified that she did nothing to prevent Father from performing his parental duties, except for putting her telephone in "do not disturb" mode for a few hours on the one occasion). Mother stated that Father had frozen her phone by calling her so much that she could not answer it; she could not hang up; and she could not do anything on it. Id. Mother testified that Father saw her family but never asked about Child. Id. at 16, 17. Mother denied that she had ever blocked Father from reaching her on Facebook Messenger. Id. at 17. She also testified that she had never changed her telephone number, her address, or her Facebook page, by which Father could have reached her. Id. Mother stated that Father also had the telephone number of her mother and both of her grandparents. Id.

Child does not know Father, and refers to Stepfather as her father. Id. at 19. Stepfather has steady employment, and wishes to adopt Child. Id. Mother testified that Child has never had a close bond with Father and has always clung to her. Id. at 31. In contrast, Mother stated that Child has an "amazing" bond with Stepfather; "[i]t's how a bond should be between a father and child." Id.

Mother indicated that she was concerned that Father's involvement in Child's life would threaten Child's stability. Id. at 25. Mother believes that reunification between Child and Father would hurt Child because Child is engaged in family–based counseling for separation anxiety and post-traumatic stress disorder ("PTSD").[9] Id. When Mother was living with Father, she took care of many of Child's needs. Id. at 26. She breastfed Child, who would not nurse from a bottle, until October 2017, when Child was two-and-a-half years old. Id. at 26. After separating from Father in April 2017, Mother told Father that she was having difficulty because she was still breastfeeding Child. Id.

Additionally, Mother does not find it acceptable for Father's grandparents to supervise visits between Father and Child. Id. Mother testified that Father's grandparents left during the last visit, which occurred

_____

[9] Mother testified that Child has been undergoing treatment with therapists for separation anxiety and PTSD. N.T., 4/9/20, at 32. Child has had therapy two or three times a week for an hour-and-a-half, commencing in December 2018. Id. at 32-33. Father has not participated in Child's therapy sessions. Id. at 33.

- 7 -

at their home. Id. Because of incidents that Mother has alleged had happened on that day, Mother never again took Child to the home of Father's grandparents. Id. Mother acknowledged that the current custodial proposal was that Father would leave Child with someone who would not leave the home. Id. at 31. At the custody conference, Mother disclosed her concern about Father seeing Child, and indicated that she did not want him involved in Child's life. Id.

Father contested Mother's allegations. Father testified that he resides with his girlfriend and her mother in Pittsburgh. Id. 35, 46-47. He does not pay rent, but assists with paying for bills and groceries. Id. at 46. Father had been working at an energy construction company for two years, and had previously been employed there for five years. Id. at 35, 45-46. He earns $24 an hour. Id. at 46.

Father testified that throughout their relationship, he would leave Mother's home when Mother would "kick [him] out" after arguments, and would later move back in. Id. at 36. Father explained that Mother's grandparents did not like him, at times. Id. Mother would sneak him into "the trailer," and into her mother's home. Id. Father and Mother "would see each other all the time." Id. When he saw Mother, he would also see Child. Id. Father insisted that, when Mother sneaked him into her trailer a number of times, it was so that he, Mother, and Child could be a family. Id. at 49.

Father acknowledged that Mother has done a lot for Child, including breastfeeding and providing her with clothing. Id. at 36-37. When Father lived with Mother, Child, and E.L.N., he paid child support, helped watch E.L.N. and Child, would help cook or cooked meals, and/or would clean the dishes. Id. He also assisted Mother in bathing the two children. Id.

Father testified that, after the September 29, 2017, telephone call, Father called and messaged Mother for a few weeks, but his calls would go directly to voicemail, and Father did not visit with Child. Id. According to Father, Mother blocked Father on her Facebook account, and he could not view Mother's profile or the profile of her family on Facebook. Id. After making attempts for a few weeks, Father gave up trying to reach Mother, because she was not answering him. Id. at 42-43. Father was aware that other members of his family had attempted to get in touch with Mother. Id. at 43. Father did not have Mother's e-mail address. Id. Father does not communicate using e-mail, but communicates via cellular telephone calls, text messages, and Facebook messages. Id.

Father would like for his entire family, consisting of Paternal Grandfather and stepmother, Paternal Grandmother, his grandparents, his brother and sister, and his cousins, to be involved in the visits. Id. Father's twin sister, who lives in Friendsville, Maryland, was present at the hearing. Id. Father's mother also lives in Friendsville. Id. at 45. Father's grandparents, father and

stepmother, and brother reside in the area local to Mother and Child and provide family support for Father. Id.

Father stated that toys make Child smile and giggle, and that, when last he knew, Child's favorite toy was Minnie Mouse. Id. at 50. Father was not certain whether Child still had a Minnie Mouse toy. Id. He did not know the name of Child's pediatrician and dentist, or her favorite food or television show. Id. Father described that, during his visits with Child, she was always a happy little girl. Id. at 50-51. The visits went fine, and they would play and interact with ease. Id. at 51.

Next, Father presented the testimony of Paternal Aunt. Id. at 51-52. She testified that, before Father and Mother separated, she had frequent contact with Child, at least monthly at the homes of her parents. Id. at 53; 58 (wherein Paternal Aunt testified that she saw Child once a month for a total of approximately twenty visits). Mother was present at the visits, which went fine. Id. at 53, 58-59. After Father separated from Mother in April 2017, he moved in with Paternal Aunt for approximately one year. Id. at 54. Father would show Paternal Aunt his attempts to get in touch with Mother. Id. After April 2017, Paternal Aunt never saw Child or Mother at her own home. Id. Paternal Aunt was aware that Father had seen Mother and Child at her grandfather's home, but Paternal Aunt was not with them. Id. Paternal Aunt would like to continue her involvement in Child's life. Id.

Paternal Aunt testified that Father had moved in with her in July 2017 and lived with her for approximately one year while she was living in Morgantown, West Virginia. Id. at 56-57. Paternal Aunt then moved to Friendsville, and Father moved there for approximately one month. Id. at 57. When Father lived with Paternal Aunt, he was working and paying half of the rent with her, with his share amounting to $500 per month. Id. at 57. Father was also paying half of the bills. Id. Thereafter, Father moved in with his girlfriend and her mother in Pittsburgh. Id.

Paternal Aunt last communicated with Mother in December 2017 regarding Child's Christmas gifts. Id. at 58. Paternal Aunt testified that, when she subsequently attempted to contact Mother, Mother's Facebook account blocked her, and she could not see Mother's photographs or posts to Facebook. Id. Mother was always present for the visits. Id. at 58-59.

Paternal Aunt testified that, from her observation of the interaction between Father and Child, Father was a great father with Child and E.L.N. Id. at 59. Both children called Father "dad" and "daddy." Id. Child and E.L.N. crawled on Father. Id. He changed their diapers, bathed them, and was very concerned about them. Id.

Next, Father presented the testimony of Paternal Grandfather, who lives with his wife and three children in Dunbar, Pennsylvania. Id. at 60. When Father and Mother were in a relationship, Paternal Grandfather would see Child approximately once a month, when Father and Mother would bring Child

and E.L.N. to his home. Id. at 60-61. Paternal Grandfather observed that Father was a very good father. Id. Father would take care of Child and play with her. Id. He would change Child's diapers and E.L.N.'s diapers. Id.

The last time that Paternal Grandfather saw Child, Father and Mother brought her to his home. Id. at 62. He was not aware of whether Father and Mother were together as a couple or were separated at the time. Id. at 62. He was uncertain as to whether the visit was before or after April 2017. Id. at 62; 66-67 (wherein Paternal Grandmother testified that she last saw Child sometime in 2017, prior to the separation of Father and Mother). When Father and Mother were together, Paternal Grandfather would send text messages to Mother and speak with her over the telephone. Id. After Father and Mother separated, the communication stopped. Id. Paternal Grandfather sent Mother a text message asking if he and his family could see Child. Id. Mother responded in a text message that she would think about it and let him know. Id. Paternal Grandfather did not receive a response. Id. He believed that legal action would be the only resolution, so he did not pursue the matter with Mother. Id.

Next, Father presented the testimony of Paternal Grandmother, who lives in Friendsville, Maryland. Id. at 64-65. Prior to the separation of Father and Mother, Paternal Grandmother would see Child when Father and Mother would bring Child to her home or when they would meet at a restaurant. Id. at 65. Paternal Grandmother stated that Mother did not want to visit her

home. Id. Prior to Father and Mother's separation, Paternal Grandmother had direct contact with Mother via Facebook posts and text messaging. Id. Mother included on her Facebook posts photographs of Father with Mother and Child, and stated that Father was a great father to Child. Id. at 65-66. Abruptly after the separation of Father and Mother, Paternal Grandmother discovered she could not access Mother's Facebook account, and she could no longer see photographs of Child. Id. Subsequently, Paternal Grandmother attempted to contact Mother but could not reach her. Id. On the day of the hearing, Paternal Grandmother discovered that Mother had unblocked her, and believed that Mother had done so because of the litigation. Id.[10, 11]

By Order dated December 23, 2019,[12] the trial court denied Mother's termination Petition:

> AND NOW, this 23th day of December, 2019, the [c]ourt hereby DENIES the Petition for Termination of Parental Rights

_____

[10] Paternal Grandmother explained that her four stepchildren are Mother's cousins, and that Paternal Grandmother's stepchildren and Mother share common grandparents. N.T., 4/9/20, at 69. Paternal Grandmother stated that there are many issues between the families. Id.

[11] Father also presented the testimony of Vozar, the court-appointed reunification counsel in the custody case. Vozar detailed her interactions with Father, and her typical method of conducting reunification counseling with a non-custodial parent. See N.T., 4/9/20, at 70-84. However, Vozar acknowledged that her input in this case pertained only to the custody action, and had no bearing on the termination proceedings. See id. at 82.

[12] The Order was entered on the docket on January 3, 2020.

previously filed on February 21, 2019.[13]

The Petition was filed on the alleged basis that Father had not made any inquiry about the [C]hild since September 22, 2017.

However, the testimony made clear that Father continues to provide child support and health insurance for the [C]hild. Father testified that he continued to call Mother's phone to inquire about the [C]hild for weeks after he was last able to speak with her, but that she did not answer his calls, and he eventually gave up. The [c]ourt credits this testimony. In addition, Father testified (without rebuttal) that Mother's own father (grandfather of the child) threatened him with physical harm if he was on the property. Father testified that he consulted an attorney, but that he did not have enough money to act until 2018.

The record is clear that he filed for partial custody on November 28, 2018, and that an interim [O]rder granting him custodial rights was entered on January 29, 2019. It is also worthy of note that Mother married the prospective adoptive (step)father [i]n October [ ] 2018, just over one month before Father filed for custody, so there was no long-term history of a bonded relationship with a person capable of adopting. ....

Under these circumstances, Mother cannot possibly establish, by clear and convincing evidence, that Father took no action during the six months preceding the filing of the Petition to [t]erminate, and she has not established that a termination would be in the [C]hild's best interests. Instead, Father was clearly doing everything the law allowed him to do. The six[-]month period began on August 21, 2018[,] and ended when the Petition was filed on February 21, 2019. During that period[,] Father filed for and successfully litigated for custody. See In re: M.R.D., 145 A.3d 1117 and In re: C.J.A.[, 204 A.3d 496 (Pa. Super. 2019)]. It appears entirely possible that Mother's Petition for [t]ermination was filed for an impermissible reason of obtaining an advantage

_____

[13] In its Statement in Lieu of Opinion, the trial court noted, and the record reflects, that Mother filed the termination Petition on February 13, 2019. See Statement in Lieu of Opinion, 3/5/20, at 1 n.1 (acknowledging the typographical error, but indicating that it is immaterial to the disposition of the case).

in the custody case. *See Wecht, J. concurring opinion in In re: M.R.D.,* supra.

Trial Court Order, 12/23/19, at 1-2 (footnote added).

On January 21, 2020, Mother filed a pro se[14] Notice of Appeal, along with a Concise Statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother now raises the following issues for our review:

A. Whether the trial court erred by failing to consider [whether] [Mother] was prejudiced by her prior counsel's delay in filing the involuntary termination of parental rights Petition, which changed the trial court's perception and analysis of the six[-]month period immediately preceding the Petition's filing under 23 Pa.C.S.[A.] §[]2511(a)(1)[?]

B. Whether the trial court erred in its legal conclusion that the mere filing of a Custody Complaint within the six-month period immediately preceding the termination Petition filing sufficiently established that [Father] "performed parental duties" according to clear judicial precedent under 23[]Pa.C.S.[A.] §[]2511(a)(1)[?]

C. Whether the trial court erred by failing to consider [Father's] significant abuse history, including inflicting abuse upon [Mother] and the minor [C]hild, lack of parental-bond [sic], and potential trauma [to] Child upon reunification, when assessing the developmental, physical, and emotional needs and welfare of Child, pursuant to 23 Pa.C.S.[A.] §[]2511(b)[?]

_____

[14] On February 5, 2020, Allison Reynolds, Esquire, entered her appearance on behalf of Mother and filed an appellate brief on Mother's behalf on April 11, 2020. *See Commonwealth v. Ellis,* 626 A.2d 1137, 1139, 1141 (Pa. 1993) (stating that there is no constitutional right to hybrid representation either at trial or on appeal). On April 23, 2020, Attorney Heid filed in this Court a Motion to Withdraw as counsel for Father. On April 28, 2020, this Court granted the Motion, advising Father that he is now proceeding pro se with the option of retaining substitute counsel. On May 4, 2020, Father filed a brief with this Court prepared by Attorney Heid, dated April 30, 2020.

D. Whether the trial court erred by failing to consider [Father's] severe drug addiction, as evidenced by testimony and a drug screen demonstrating he is an active drug user, when accessing [sic] the developmental, physical, and emotional needs and welfare of [ ] Child, and its impact on [the] emotional parent–child bond as required pursuant to 23 Pa.C.S.[A.] §[]2511(b) best interest analysis[?]

Mother's Brief at 3-4.

In an appeal from an order granting or denying a petition for termination of parental rights,

our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

In re T.C., 984 A.2d 549, 551 (Pa. Super. 2009) (citation omitted). "[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." Id. (citation and quotation marks omitted).

- 16 -

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of subsection 2511(b). See In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). Section 2511(a)(1) and (b), which provide as follows:

> § 2511. Grounds for involuntary termination
>
> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
>> * * *
>
> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court

must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

In re Adoption of Charles E.D.M., 708 A.2d 88, 92 (Pa. 1988).

Further,

[t]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

* * *

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

* * *

Where a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has a duty to exert himself, to take and maintain a place of importance in the child's life.

Id. 856 A.2d at 854-56 (citations omitted).

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection 2511(b) are satisfied. See In re Adoption of C.L.G., 956 A.2d 999, 1009 (Pa. Super. 2008) (en banc). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). Id. at 1008.

Regarding section 2511(b), our Supreme Court has explained as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). In In re E.M., [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791.

In re: T.S.M., 71 A.3d 251, 267 (Pa. 2013).

We will address Mother's first and second issues together, as both relate to the trial court's consideration of section 2511(a)(1). In her first claim, Mother argues that Father had not performed parental duties for over 14 months, and that he simply filed a custody Complaint within the 6 months prior to the filing of her termination Petition. Mother's Brief at 24; see also

id. (explaining that Mother had sought counsel in November 2018, after 14 months of no contact by Father, but the filing was delayed by counsel). Additionally, Mother claims that Attorney Kelly failed to engage in proper conflict checking practices, which resulted in further delay. Id. at 25; see also id. (alleging that when Attorney Kelly attempted to serve Father with the termination Petition at a custody mediation, Father stated that he had previously met with Attorney Kelly to discuss custody).

In her second issue, Mother asserts that Father's filing of a custody Complaint does not satisfy the requirement that he perform parental duties under section 2511(a)(1). Id. at 26. According to Mother, Father has not taken any affirmative steps to assert his parental interests, and did not attempt to contact or visit with Child. Id. at 28-29. Mother claims that Father only contacted her a "handful of times" in 2017, and that he never inquired about Child's well-being or attempted to send cards or gifts. Id. at 28-29, 41. Mother avers that she did not file the termination Petition simply to thwart Father's custody case. Id. at 37. Mother also claims that she "acted to protect Child from the trauma of reunification with Father due to his abandonment, history of violence against Mother and children, and extended history of drug[]use." Id. Further, Mother asserts that the GAL did not adequately consider Child's bond with Stepfather. Id. at 43, 45.

The trial court addressed Mother's first two issues together, as follows:

> Mother filed her Petition on February 13, 2019, alleging that Father had "evidenced a settled purpose of relinquishing parental

claim and has refused to perform parental duties" for "a period of at least six months immediately preceding the filing of this petition." However, it was established beyond doubt that Father had filed a [C]omplaint for partial custody on November 28, 2018, and had obtained an Order granting him custodial rights on January 29, 2019. Both of those events occurred during the "six months immediately preceding the filing of this petition."

Moreover, [the trial court] found that Mother actively sabotaged Father's attempts to remain in the [C]hild's life by cutting off communications and by having her father threaten [Father] to stay away. In addition, the [trial court] found that Mother did not carry her burden of proving that the [t]ermination would be in the best interests of the [C]hild, largely because she married the proposed adoptive father only about a month before the custody [C]omplaint was filed.

* * *

In the Order dated December 23, 2019, [the trial court] addressed several of these issues and hereby incorporates that Order by reference.

As far as the fact that she filed her Petition after Father first filed for custody, her explanation or excuse for the delay in filing is irrelevant. The six[-]month period runs backwards from the date the Petition to [t]erminate was actually filed. Moreover, her explanation or excuse is not credible, as her previous counsel could not have been simultaneously working on custody for Father and termination for Mother. Counsel was not presented as a witness. Finally, the [trial court's] decision to deny termination was not based on Mother filing the termination [P]etition to obtain an impermissible advantage in the custody case[;] the undersigned merely commented that it was "entirely possible" that it was her motive.

As far as her assertion that Father could have texted her to continue communication with the [C]hild, [the trial court] believes that to be irrelevant as well, considering all of the other facts and circumstances in this case. There was credible testimony from Father and at least two other witnesses in his family that they were all "blocked" from communications with Mother. [The trial court] finds Mother's testimony to the contrary to be incredible. Also, Mother claims Father had no communication for "over two

years," which is simply hyperbole. Accepting as true her assertion that she cut off Father's communication with the [C]hild on September 22, [sic] 2017, Father filed for partial custody on November 28, 2018, a period of 14 months and 6 days. As noted above, the Petition to [t]erminate was not filed until February 13, 2019, some two[-]and[-]one-half months later. It is worthy of note that the conversation that resulted in the "blocking" of communications with Father and his family was Father asking to take the [C]hild to the zoo – and that Mother admits that she left the decision on whether or not to go to the two[-]year[-]old[-] child!

Trial Court Statement in Lieu of Opinion, 3/5/20, at 1-4.

The record supports the trial court's findings. Here, Father, Paternal Grandmother, and Paternal Aunt all testified that Mother had blocked them from contacting her for many months. Additionally, Father testified that Mother told him that, if he attempted to visit the property owned by her grandfather where she and Child resided, her father would call the police and have Father arrested. The trial court found that these matters were obstacles created by Mother to prevent Father from having contact with Child. See In re: B.N.M., 856 A.2d at 855-56. After a careful review of the record, we conclude that the trial court's credibility and weight determinations are supported by the testimony in the record. See In re T.C., supra. Discerning no abuse of the trial court's discretion, we will not disturb these findings.

Because Mother failed to support her allegation that termination was appropriate under section 2511(a)(1), the trial court did not need to address

whether Mother satisfied her burden under section 2511(b).[15] Nevertheless, we will review Mother's allegations concerning section 2511(b)—set forth in the third and fourth issues—together, as they are related. In her third issue, Mother contends that the trial court failed to consider Father's history of abuse in addressing Child's emotional needs and welfare pursuant to section 2511(b). Mother's Brief at 57. Additionally, Mother cites Father's issues with "instability, a lack of income, drug addiction dating back to high school, and a history of criminal behavior that supported termination." Id. at 58.

In her fourth issue, Mother asserts that the trial court did not appropriately consider Father's history of drug addiction. Id. at 60. Mother believes that Father's drug use affects his ability to form an emotional bond with Child. Id. at 60-61.

The trial court addressed Mother's third and fourth issues as follows:

> Mother's claim of "significant abuse" also involves matters that are either off the record, or that Mother has exaggerated. The only reference in the record that could suggest any "abuse" is an off-hand reference to an arrest of Father that occurred during or after a visit with Mother. There was no testimony as to what the arrest was for. Mother's bias is clear, and it adversely impacts the credibility of her testimony. It appears she will say almost anything to "win."
>
> Mother's allegation concerning "[Father's] severe drug addiction" falls in the same category, as the only reference in the record is in the testimony of the reunification counselor who

_____

[15] Thus, we need not address Mother's contention that Father's filing of a custody Complaint was insufficient to amount to contact by Father with Child during the six-month period preceding her filing of her termination Petition against Father, and the cases she cites in her brief for this issue.

mentioned that Father tested positive for opioids on one occasion, and[,] even though he told her it was a prescribed medication, she recommended random drug testing. There was no positive testimony concerning illegal drug use of any kind, much less "severe drug addiction."

There may have been more that could have been elicited on both subjects, but no such additional evidence was presented, and Mother is the party with the burden of proof.

Trial Court Statement in Lieu of Opinion, 3/5/20, at 4-5.

Upon review, we conclude that the trial court's credibility and weight determinations are supported by the record. See In re T.C., supra. We perceive no error or abuse of the trial court's discretion with the finding that Mother failed to sustain her burden of proving that termination of Father's

parental rights is in the best interests of Child pursuant to section 2511(b).[16]

Accordingly, we affirm the trial court Order on the basis of the discussion in the trial court's Statement in Lieu of Opinion, supra.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/7/2020

---

[16] We agree with the trial court that Mother did not present sufficient evidence at the hearing to establish that the termination of Father's parental rights pursuant to section 2511(b) is in the best interest of Child. Mother's contention that the trial court improperly and solely found that section 2511(b) was not met because of her marriage to Stepfather within the six-month period preceding the filing of the termination petition, one month before Father filed his custody Complaint, is not borne out by the record. See Mother's Brief at 15. The trial court's comment about the recentness of Mother's marriage to Stepfather appears to be only an observation on the part of the trial court as to Mother's motivations and credibility with regard to her allegations against Father. The comment relates to whether the termination of Father's parental rights would be in Child's best interests, in general, and is not part of a section 2511(b) analysis. See Trial Court Statement in Lieu of Opinion, 3/5/20, at 1-5.